Good morning, your honors. I'm going to please the court. My name is Sean Perez and I represent Seda Zakaryan, the petitioner in this matter. I'll be brief because really it boils down to one issue, and that's whether or not the failure of the petitioner to produce her son in the immigration court was fatal to her petition. The immigration court determined that she didn't meet her burden because she wasn't able to corroborate past persecution or her situation in Armenia at the time. But what this fails to recognize is that the son, Zarkady, was gone. He left in 2001. The persecution of his wife, who was subsequently granted asylum in 2005, I believe, or 2006, went on for a number of years. I mean, there were shootings into the residence where the daughter-in-law and Mrs. Zarkadyan lived. The daughter-in-law was kidnapped, raped, tortured, beaten, and as a result of the— But really the central issue is the question of notice. Did the IJ give her adequate notice and an opportunity under Wren to — so that she could understand that, in fact, this person should testify, the brother should testify, or that she was going to be held — or the son testify, or she was going to be held accountable for the lack of provision of that testimony? She was given notice that she should produce whatever evidence was available to her. But the evidence was not what happened with the son, you know, six years previous, because he wasn't there. He did not witness any of the persecution of the wife. And the Court made a point of — the immigration judge said, well, the initial judge in the daughter-in-law's case was concerned with the whereabouts of Arkady at that time. That wasn't an issue now. I mean, clearly he was here. He was granted residence status at the time. Could she have produced him? I mean, she should have, perhaps. I mean, I'll concede that he was here. He wouldn't testify. So what are you saying the IJ's obligation in regard to notice is? And also, not only the notice requirements, but also the timing of the notice, and that is, does the notice that, in fact, she is to call another corroborating witness happen after she testifies, in which her credibility is then being assessed, or can an earlier notice that she should call relevant people satisfy their obligation? That's an interesting question. It goes to what needs to be corroborated here. I mean, are we talking about corroboration of why this persecution started in the first place, or are we talking about what actually happened to her? Now, clearly she was given notice throughout that she would have to produce some corroboration or what have you, and this went on for a while. I mean, the corroborating evidence was, in fact, the daughter-in-law that ultimately died from her injuries that she suffered in Armenia. Well, but the issue was the persecution of the petitioner, not — I mean, I don't think there was any dispute about what happened to the daughter-in-law. Correct. But the question was whether or not the espoused persecution of the petitioner happened, and that was the need for corroboration, not just that she could bootstrap her cell phone to the persecution that happened to the daughter-in-law, but that her own persecution had to be corroborated. Right. And the immigration judge relied on the son, but the son wasn't there. He couldn't corroborate anything. He could say, oh, yeah, you know, I was gone for six years, but, you know, I think she was beat. I mean, I was told that. Well, oftentimes family members are able to corroborate conversations that were held regarding what was happening at the time. We don't know because the son didn't testify, so we would only be speculating. But it's not unusual for family members to be called to corroborate events at which they were not present. And I would agree with that. But going back to Your Honor's question about notice and the timing of notice and what type of notice should have been given, there was notice given, but... Notice was given earlier on, way before it was actually transferred to Las Vegas. That's correct. There was some notice that perhaps the son would be a relevant witness, together with the daughter who died. Right. But there was no statement, was there, unless I'm totally incorrect, there was no statement by any I.J., including the first one or then the second one, in which the I.J. said you have to call this particular person because it's relevant to credibility analysis of the Petitioner, was there? Did anyone ever say either you call this person or else I'm going to rule against you because you haven't corroborated your testimony and your credibility as an issue? Wasn't that all an — this is Wren v. Holder, right? Right. Wasn't this all ignored? It was ignored. I mean, she wasn't given notice that she would have to produce him. In fact, I think the last notice was you'll have to produce some type of corroborating evidence if it's available to you, but nothing was ever said as to what that might be. And prior cases seem to indicate that if the Petitioner testifies and the immigration judge is so concerned with credibility that they would say, well, you know, I think you need to bring someone else in, or if it's available. I mean, they've given — Isn't there, under Wren v. Holder, isn't there an obligation that when, in fact, the has some questions about the Petitioner's credibility after the Petitioner has testified that the I.J. then says, this is the kind of evidence I need, this is the person you have to call, you're on notice that unless you call that person or provide that testimony, then the fact that you failed to do that would be used against you? Isn't that what Wren v. Holder requires? I believe that's correct, Your Honor. And my question is, to what extent did the I.J. in this particular case comply with that Ninth Circuit precedent? There was no compliance with that. There was nothing that said, you know, bring Zarkady in. Nothing at all. It was all after the fact. Oh, you know, well, we've heard this testimony that was, you know, thank you very much. Any closing argument? No, not really. You know, I'll take it under submission, I'll write my decision, and that was the end of it. So, counsel, if we agree with you, what is the — and grant the petition, what would you envision happening as a result of the petition being granted? Well, at the very least, I would think that it would be remanded back to the — to the Immigration Court. I mean, if they need the credibility and they need the testimony of Zarkady, although I don't know why. To give the notice? Right. To give the notice. Specified notice? Correct. Your Honor, I'll submit. Thank you. All right. Thank you. You have one minute left for rebuttal. Good morning. May it please the Court. My name is Kate Balaban. I'm here representing the government today. I think I should just start with Judge Sessions's line of questioning regarding notice, because that's key. I, by the way, am a distant relative to the Sessions, who's the party in this case. Very distant, but related. But go ahead. I won't touch that, Your Honor. Good move. So I think that the key piece of evidence in the record here goes back to 2012, the colloquy between the I.J. and Los Angeles and Petitioner's counsel. The attorney for the government for ICE at that point said — suggested that the government really needed to hear from the son, because the son was at the center of the asylum application. In her application, she claims it's her status as his mother that was the cause of her persecution, or at least one of them. So the I.J. says he's sort of the center of the operative facts here. And the attorney for Petitioner says the problem is that he lives in Las Vegas, so we're not sure we can produce him. And the I.J. says, okay, we're going to transfer a venue so that the son can testify and, quote, I do believe that the son is a key witness. That's 2012. Go forward to the 2014 merits hearing. It is fair to say that by 2012, the Petitioner had not testified, and there had been no determination as to whether the Petitioner was credible or not credible. That's true. That's true. I want to — I want you to look at 2014, though, in light of Wren, Wren's key. And I'll direct you, please, to footnote 12 in Wren, where the Court says we require notice and there has to be a proper sequencing, but it is not necessarily the case that you need two hearings. And they admit, the Court admits of the possibility that in a situation where the Petitioner comes forward at the merits hearing and says, I cannot produce evidence X, I can't produce this piece of corroboration, it's not available to me, that that might constitute — there might be notice in that instance. You may not need a separate hearing. You used the word sequencing. Right. So what do you think sequencing means in the Wren v. Holder opinion? So I think that the Ninth Circuit, the Court hasn't gone as far and that we shouldn't go as far to say that sequencing requires two hearings. And in this instance, the sequencing is they looked at the asylum, they look at the asylum application in all of these calendar hearings. They look at the wealth of evidence. They haven't heard her testimony yet. But a counsel for the government says, I think we need to hear from the son. The IJ says, I think we need to hear from the son. The Petitioner's counsel says, the son's in Las Vegas. The IJ says, let's move it to Las Vegas. We need to hear from the son. Well, doesn't sequencing mean that Petitioner first has to testify and there has to be a determination by the IJ that there is some credibility issue? That's step one. That's what sequencing means under Wren, doesn't it? That is, that they actually establish the issue of credibility. And then to respond to the issue of credibility, once she has testified, then you talk about what evidence specifically you need to corroborate. Isn't that what Wren says? I'll concede to Your Honor that Wren could say that, but it hasn't said. It didn't say it specifically. And the footnote suggests otherwise. Because if that's the case, if sequencing requires that you hear the testimony and make a determination as to credibility first, then you do necessarily need two hearings. And I think it's specifically contemplated in Wren that in certain circumstances you wouldn't need two hearings. You could have an IJ say, I'll listen to your testimony and I may even find it credible, but I'm going to need to hear from the son. It doesn't necessarily require a second hearing, assuming the son is with her at the hearing in the first place. I'm not so sure it necessarily requires two separate hearings. But I always thought the sequencing from Wren suggests that you have to make first a determination that credibility is at issue, and then second, identify to the Petitioner exactly what corroboration you need. That may be true. I don't think it is true. I don't – I hope we don't go in that direction. That would extend Wren in a way that it hasn't been looking at the case law. And I'm not sure that this is the right case to do that, because it seems to me that she was put on notice and that the transfer of venue is noticed, that they said we need the son. There's no question in this case that she knew that the son's testimony was vital, was important. But then she submitted an affidavit or a letter from a treating physician, a psychologist, which basically said that this son is suffering from depression from the death of his wife, et cetera, and really is unable to testify in the Federal case. And the question is whether or not the IJ made a determination that that was an inadequate excuse as to not to call him. Is that – That's correct, Your Honor. And I think that it's really important to separate out analytically Issue 2 from Issue 1. Issue 2 is whether or not it was reasonable for this second IJ in Las Vegas to conclude that, based on that letter, based on that piece of evidence, that it was reasonable for the IJ to conclude that she could not produce that piece of corroboration. So let's assume that she had proper notice, and then the question is, was it reasonable? Now, it's important to note at the outset that's under the substantial evidence doctrine, and it's the IJ who looked at the letter, who looked at the circumstances, who looked at the totality and judged, you know what, based on this letter, I don't think that's enough. The letter was from a psychologist, and it did say he had PTSD, but there was no affidavit offered in lieu of the letter, and the letter didn't have a time frame. It didn't say perhaps at some point, future point, he might be able to testify. Can you tell me, did the IJ ever say that? Did the IJ actually make an assessment as to the adequacy of that particular letter and say, this is essentially inadequate, before then ultimately making a determination that it was not justified? I think that the IJ did not point to those specific facts, except for he said, I don't think it's reasonable, in light of the evidence, all of the evidence, that the son can't either testify or that you didn't ask for a continuance for him to testify. later, or ask for a continuance for some further corroboration. During the course of the hearing, did the IJ ever turn to the petitioner and say, I really think that you should be able to call your son? Or was this in the final, ultimate written findings? It was in the, I would have to double check. I'm not sure in the context of the merits hearing whether or not the IJ said that, and I'm also not sure why it would be necessarily relevant, given that she's already come forward with a letter saying he can't testify. But if she's unnoticed, that, in fact, if you don't call him, your son, then I'm going to hold that against you, and it's going to have bearing on my determination of your credibility. Well, now I think If anybody ever said that to her, she could very well have then responded by trying to persuade her son, obviously, to testify. I thought the record never indicated that the IJ said anything to her about how the IJ was going to assess failure to call the son. But you may be, well. No, I think that you make a great point. The problem here is it's very easy to conflate the two issues of notice and whether or not it was reasonable. Well, here's what I don't understand. This doesn't make a lot of sense to me. If she was on notice that she had to provide corroboration in the form of her son, and they went to Las Vegas, and she puts in a letter that he can't testify, why would she do that? I'm sorry. I didn't follow the question. Why would she argue that he can't testify? Because she's been put on notice that everybody wants to hear his testimony. So she She's been put on notice that she's going to lose if she doesn't provide his testimony. Why would she then say he can't testify? Because she's been put on notice that that testimony is considered critical, and Petitioner's And we understand that you think it's critical, but he simply can't come. He can't testify. And I think what the I.J.'s problem was, the Las Vegas I.J.'s problem was, well, then ask for a continuance, supply some other corroboration. You just can't produce a letter saying the problem is the I.J. didn't tell her that. The I.J. didn't say this is a problem. You know, you need to we need to get a continuance or something, but the I.J. didn't say this. And I understand, and the only thing I would do is to circle back to my earlier point that she's on notice that it's important, that it's vital. She's on notice because otherwise they wouldn't have transferred the venue to Las Vegas. Was there an adverse credibility determination ever made by the I.J.? No, there was not, Your Honor. And that's part of the problem here, is that if the I.J. never made an adverse credibility determination, how was she on notice that corroboration was required? And if that's the way that it works, then we are requiring a two-step process of a hearing to judge credibility with either adverse or positive credibility finding and then a second hearing. No, no, that's not true, because the I.J. could have made the adverse credibility determination, could have told her, I don't believe you or I don't know what to believe in this case. Therefore, corroboration is required. And so that would have been easy for the I.J. to do. It's all about fairness to her and putting her on notice as to what she needs for her case. Right. I understand. I think I just reiterate that I think that they are two separate issues, that she was put on notice, and then the question is, is it reasonable for the I.J. to have determined? The problem is she hadn't testified yet when she was told that the agency considered the son's testimony to be central to her. That was way before she testified. And then there was no indication given to her that her testimony was in any way less than credible. I understand, Your Honor. With my remaining time, I do want to make a point. You're in the red. You're in the red. As always. I would like to point out that if you disagree with me on the point of notice and the reasonability regarding the I.J.'s determination, that we need to have a remand to determine the persecution issues, the nexus. There's no nexus finding, and there's no... So you suggest that we would remand on an open remand. In the record. Is that what you're saying? I think the record would need to be further developed and that the I.J. would have to make a determination on both the level of harm that she suffered, whether it constitutes persecution, and whether it was on account of a protected ground. All right. Thank you, counsel. Thank you so much. Rebuttal. Thank you. I'll be brief. In the record at 160-162, this was from the June 7, 2012, hearing, the judge said it's simply unfair to, for example, deny an application for relief based upon a failure to present corroboration if the respondent wasn't provided sufficient notice. Are you talking about Wren? Yes. Or. Well, this was from the judge saying this in open court. Oh, in this case. Yes. Or if the respondent is left guessing, to guess concerning what corroboration the judge was looking for. And that's the problem here. We don't know. And then the other point I'd like to make is... But opposing counsel says that your client did know because early on in the proceeding she was advised that her claim was predicated on what happened to her son, and so her son's claim was central to her claim. What's your response to that? It's not all that clear that that was central to the claim or that that was the position of the immigration judge at that point in time. One of the things I would like to point out is, you know, we keep going back to this was moved to Las Vegas to accommodate the son. That's not the case. It was moved to Las Vegas to accommodate the daughter-in-law who subsequently died between the transfer of the case from Los Angeles to Las Vegas. But the son was there as well. Well, they were all in Las Vegas all at the time. It was because of the family. Right. The family was there. Right. I mean, so it wasn't specifically to have Arkady testify or to be convenient for him. I mean, at the time the venue was changed, the daughter-in-law was living. Granted, she had, you know, two children to take care of. And, you know, all indications were, hey, we're going to give her time to, you know, be able to testify. She clearly was suffering from what happened to her, and ultimately she died as a result. I don't think there can be any more compelling evidence than death in this particular instance. On that, I'll submit your honor. Thank you very much. Thank you. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Schroeder, Rawlinson, Sessions